In our official business, we have family business to attend to, one of those pleasant occasions when one of our law clerks wants to become a member of the bar. So, I ask Judge Rayner if he has a motion to make. Yes, Your Honor, I have a motion to make. I'd like to proceed the motion with a couple of statements on Natalie Bennett. You know, it's amazing how fast time goes by when you're working hard. And during this past year that you served as my clerk, I have been tremendously impressed by your work ethic. I can't count the number of times I've come to chambers before 7 a.m. to find you there working, working steadily away. And, you know, it's your excellent work product that is a fruit of your work ethic. And your work here has benefited not only me, everybody in my chambers, but this entire distinguished court. I've also observed that you've earned the respect of all your peers, not only because of your legal proudness, but because of your vast abilities on the baseball field. I wish you the best of luck, Natalie, in the future. And I know that before me stands a strong, independent woman, an excellent lawyer, and one of America's who's going to become one of America's leading U.S. patent litigators. Thank you so much, and we're going to miss you. With that, Judge Lorre, I move for the admission of Natalie Bennett, who is a member of the bar in the good standing of the highest courts of Illinois, Minnesota, and the Eastern District of Texas. I have knowledge of her credentials and am satisfied that she possesses all of the necessary qualifications. Thank you, Judge Rainer. I think I need to consult with the rest of my panel. Judge Rainer's knowledge of Ms. Bennett and his superb comments make it clear that we should grant the motion. So if you'll step up and take the oath from the clerk of court. Congratulations, Ms. Bennett. Welcome to the bar of the court. Our official business this morning consists of six cases, two patent cases, a case from the Armed Services Board of Contract Appeals, a veterans case, and two government employee appeals, one of which, and the veterans case, will not be argued and are being submitted only on the briefs. So our first case in the four argued cases is Appledine versus AU Optronics and Kaimei Opto Electronics and Samsung versus these three. There are so many parties here, it's hard to keep them straight. 2012-11-72, Mr. Seidman. Thank you, Your Honor. May it please the court, we're here today because the district court granted summary judgment against Appledine in ruling that the accused products of AU and CO did not infringe. The 382 patent is directed at achieving faster response times in eigenaxis mode liquid crystal cell retarders by supplying free amplitudes of voltage, including the most important part of the invention, a middle overdrive voltage. You started right at a point that's at the heart of my interest in the case. And when I look at the claims of the patent, it seems to me that it's limited to AC drive signals, is that correct? The patent, yes, the description, claim one is certainly AC drive signals. It doesn't teach anything other than an AC drive signal, the patent. I would agree with that, yes. You have to use an AC drive signal in order for it to work. If you use the DC signal, it would actually degrade the liquid crystal material so badly, so it wouldn't work. So it's limited to an AC signal? Yes. Okay. Yes. Without the patent's overdrive invention, LCD televisions and monitors using the dominant form of technology, of that technology today, which is vertically aligned eigenaxis mode liquid crystal cells, the images would be too blurry and the picture quality would be too poor to be commercially successful. I like to use claims 20 and 1 as the claims we're focusing on, because those are the claims that have really been focused on in the briefs. Claim 20 is an independent method claim, and the method has three steps. The first is to supply a voltage signal to the retarder corresponding to the initial retardness level that you're seeking to reach. The second step is to change that voltage signal to a new overdrive voltage amplitude that is greater than necessary to reach the desired second target retardance. The third step is to change the voltage signal to a lower third amplitude that corresponds to the target retardance itself. You're referring to claim 20 right now? Yes, this claim 20, yes. Did you argue below that claim 20 did not require construction? No, what was argued below was that many of the, in the claim construction briefs, some of the terms in claim 20, the construction would be the same as in claim 1. And then the argument was that the remaining terms in claim 20 did not need further construction because they were well understood by artisans in the field. So there was no argument that claim 20 didn't need construction. It's actually very unclear why the district court granted summary judgment on claim 20 because there is certainly no separate discussion. There's not even a mention in either of the two opinions of claim 20 individually. And as we've argued in our briefs, that in itself is reversible error under the generation 2 case. CMO argues here that, well, the court really did address claim 20 without specifically mentioning it because the court believed CMO and AUO's argument that Appledine offered, quote, no evidence that the accused products changed retardance as a result of three voltage amplitudes from a drive means as required by the patent. Now, of course, claim 20 doesn't have, doesn't mention drive means at all, and the signal could come from anywhere. So that part certainly doesn't apply to claim 20. But giving the court benefit of the doubt, giving CMO's argument benefit of the doubt, looking solely at the three amplitude issue, this conclusion that there was no evidence of the use of three amplitude overdrive is difficult to comprehend. Appledine's expert, Dr. Metz, devoted 13 pages in his CMO report. You will find those in JA 333 to 45, describing how CMO's own documents and testimony demonstrate CMO's use of the patents overdrive method and the three amplitude overdrive method. And then you go to JA 436 to 38, Dr. Metz detailed how a CMO figure from their website is annotated by CMO witness, Mr. Tsai, and looking at Mr. Tsai's explanatory testimony of that, that these show CMO's use of a first voltage V1, corresponding to the optical response of the starting grayscale value. The second voltage V2, and a third voltage V3, corresponding to the optical response for the second target grayscale value. When I look at the expert's testimony, the expert you're referring to, I don't see that he ever referred to a voltage differential as being, as itself being a single. He seems to have said that they're different. That the voltage differential, or the voltage difference, is itself a single. Well, the signal is the voltage supplied to the display, or as it's often been called here, the pixel electrode. And that is the voltage signal that is supplied that causes the change. Now, Dr. Metz explained the physics behind that as supplying the voltage signal to the display electrode causes a voltage differential between the display electrode and the common or bias electrode. And that physically causes an electric field, which itself causes a reorientation of the liquid crystal molecules. So he does talk about the voltage signal to the display electrodes. Does that answer your question? Sure. Okay, very good. And Dr. Metz testified that the intermediate second voltage signal is an overdrive signal, a signal higher than the V3 signal, the third voltage signal that sustains the second retardance. And then he used a specific example from CMO's own tables, where the grayscale value changes from 45 to 60. And you have the voltage corresponding to 45 and the final voltage corresponding to 60. And then you have the intermediate grayscale value of 118. So that's clearly an overdrive voltage. Since the grayscale values correspond to specific electric signals applied to display electrodes, Dr. Metz concludes there, that this example shows CMO's practice of the invention. Dr. Metz went on to confirm that both CMO and AUO's devices, in fact, practiced what their documents and testimony showed by conducting tests on samples of their displays. Under the crown packaging versus rectum case, this expert testimony was enough to defeat summary judgment on claim 20. It doesn't matter what defendants' experts said, what tests he conducted, what measurements he took, what conclusions Dr. Poquier drew from his tests. The case goes to the jury for the jury to decide, okay, which expert am I going to believe? So summary judgment clearly should not have been granted as claim 20. There also is another argument the defendants made and the district court accepted, and that was that there's somehow a difference between signal 2 versus voltage differential across. I think we've hammered that pretty hard in the briefing, and unless the court has any questions about that, I won't address that. The voltage across the electrodes of a liquid crystal display, they remain constant, correct? The voltage differential? No, it changed. But in order, for a period of time, it'll remain constant. And then there's a fluctuation, but every time it fluctuates, it remains constant for a second in order to allow the molecules to transmit light, allow light in and out. Exactly, Judge Arena. Now, how is it that that can be an AC signal that causes that to happen? Doesn't an AC signal, isn't it alternating by itself? Well, the AC signal is a square wave, a rectangular wave, and without getting into the... So something has to happen to that AC signal before it becomes voltage across the electrodes of the liquid crystal? Yeah, what the AC signal does and what it means is that it varies from positive to negative, and that complicates what you have to do. I'm giving a little bit of an oversimplification for how it works, because if you're starting out and you want to go higher, but you're going to negative... Well, correct me if I'm wrong, but the AC signal alternates between negative and positive charges? Yes. Okay, so we were just talking about how the voltage across the electrodes of a liquid crystal display has to remain constant at a certain point in time. Don't you have to control an AC signal in order to be able to reach that constant stage? Yes, you have a... How does your patent do that? Well, the patent calls for... The drive needs in the patent calls for an amplitude modulator, and I always forget what the third word is. So would you say that the signal that reaches the electrodes is different from the AC signal? The signal that reaches the electrodes is different from... It's still an AC signal. Oh, the voltage, okay. It's still an AC signal. All right. I see I'm into my... You may save it or use it. All right. Well, let me move to claim one, and the real dispute there is whether or not the accused products use the drive needs called for in the patent. And that's... The district court concluded that the products don't practice claim one because the voltage charge comes from the storage capacitor, not the, quote, source driver that the defendant's products use. Now, there are multiple problems with that conclusion, but the biggest problem is, of course, equating this source driver with the drive needs. And in fact, the storage capacitor itself, as Dr. Metz testified, or opined, is part of the drive needs. It's not part of the retarder or the retarder needs. In fact, there's no dispute among the parties as to what the retarder consists of. And so when you're looking at it from the perspective of claim one, you look at... In other words, there are no genuine issues of material fact. Do you think infringement is clear? No, because Dr. Yeh clearly gave testimony, which a jury, I suppose, couldn't believe that he didn't find three amplitudes when he measured it. So we wouldn't move for summary judgment. But when you look at what Dr. Metz opined, he clearly found the three amplitude signal from a drive needs, as he described. I'll reserve the balance of my time. We will hold it for you, Mr. Seidman. We're going to have a split argument here. Mr. Gotts, you're going to take nine minutes. Correct, Your Honor. Thank you. And may it please the court, Larry Gotts for the AU of the felons. Your Honor, I'm going to address the portion of the argument that relates to the supplying and three amplitude limitations of the claims, which was the basis for summary judgment in the November 15th opinion. And what I heard today, frankly, Your Honor, doubles down on exactly the reason summary judgment was granted. And I'm going to try to dissect that for the court so the court will understand. There was no discussion today about the supplying limitation of the claims. What counsel for Appledine has referred to is, what is the voltage at the electrode? And that's all that Dr. Metz analyzed. He looked at the electrodes. So, for example, if you look at the figure on page three of the reply, Appledine's reply, they have this red box, which is the pixel electrode. That's the retarder, right? Now, the electrode is two plates with a liquid crystal in between. And it has a voltage, right, in there. And that voltage is what alters the positioning of the crystals. The claim doesn't claim the voltage between those electrodes. The claim very clearly, by its plain meaning, claims supplying a signal to those electrodes. What Appledine did was it looked only at the voltage between those electrodes and ignored the supplying limitation entirely. There is no evidence in this record. No fact disputes because there's no evidence in this record. Any signal which is supplied to the retarder, to those plates, that has these requisite three amplitudes. Why is that? Well, because in the accused products, they are designed entirely different for a multi-display, multi-pixel device. So they don't have one voltage that, as Judge Reyna was indicating, another voltage or another voltage. They have one pulse for one row, another pulse for another, another pulse. So it's a result of a series of pulses. Now, those pulses do not have the requisite three amplitudes. But more importantly, their expert, Dr. Metz, affirmatively said in the record that he is not relying upon the signal supplied, the pulses. He's only looking at the voltage between. Well, once you do that, you've got absolute failure of evidence. You have to hold the claim. They can't rewrite the claim. The claim is directed to the signal supplied. Their expert intentionally did not look at the signal supplied. He instead looked at the resulting voltage. And why did he do that? Because he knew that if you looked at the signal supplied. What generates the voltage pulses that you referred to? The voltages are generated by, first, a timing controller, which is then connected to a drive source, which generates a pulse, which then gets fed to a TFT, a thin-film transistor, which is a switch. And that switch goes on for a pulse period and goes down and down for each one. Once that pulse gets introduced, it gets fed to a common bar, which feeds a storage capacitor and the device. They never analyzed the signal that's supplied. It's that simple. That's exactly what Judge Robinson found. No evidence in the record of a supplied signal. There was no evidence discussed today of a supplied signal. We heard about what the voltages looked like across the electrodes, but we heard no more, no less. That doesn't address the claim. That summary doesn't. Now, we also didn't hear anything today about what was a brand-new argument. You're saying that there's no evidence of a supplied signal, but isn't a voltage also a signal? Let me correct myself. There's no evidence of a supplied signal which has a free amplitude limitation. I'm the spook here. I'm thinking. And they didn't analyze the supplied signal at all. They only looked at the voltages because they knew they couldn't find the free amplitudes in the supplied signal. So they only looked at the voltages. Now, in the pattern, it may well be that the signal of supply is the same as the voltages because it's a simple device, which has one direct connection to one pixel electrode, but that's not the way it works here. Here, the supplied signals are a series of pulses, which boom, boom, boom, boom, ratchets their way down the display at each row, and they never analyzed that signal. And Dr. Metz affirmatively said in his, in the record, at JA7526, not only did he not analyze it, he said looking at the supplied signal there would be looking in the wrong place. So we know why he didn't look, because he didn't think he should and because he couldn't prove the case. Now, second point is, they knew that Appledyne must have understood this problem when it came to its reply brief, because they came up with an entirely new argument in their reply brief, which wasn't even raised today for reasons I don't understand. But all of a sudden, in the reply brief at pages three and five, Appledyne now points to something they call a signal to the retarder. Right? Something that is, they point to it. The only reason they get there, the only way they get there, I should say, is by modifying the hearing exhibits on summary judgment to add the word signal to the retarder. It wasn't, it wasn't argued. They had to actually change the exhibits. They admit that in their brief. And they never, their expert never said there was such a signal to the retarder that had the amplitudes. And, in fact, everything they point to in their reply brief doesn't, doesn't show a signal to the retarder, and more importantly, it doesn't show the amplitudes of any signal to the retarder. Now, their expert did testify, and this is at JA 5467-68, and I'm just going to read one line in connection to what you're arguing now, counsel. It says, it is this voltage difference, not the initial data signal from the source driver, that creates an electric field across a subpixel that reorients the liquid crystal material and hence changes the retardance and brightness levels. Isn't that a reference to two different signals? No, no. That is a reference to what's going on, again, in the picture, inside the red box in the pixel electrode. That is the voltage inside the electrode. But the claims talk about the signal supplied to the retarder, and he never references anywhere what the signal supplied to the retarder is. We'd have to rewrite the claim to say we're only looking at voltages in the electrode, but never the supply. And it turns out, in the accused product, as they know, and as undisputed, the supplied signal doesn't look like that. It's a pulse. It doesn't have that voltage or the three amplitudes. And in fact, as I said, in the reply, that's when they came to rewriting their position, not in re-argument, not in their opening brief, in reply, all of a sudden they come up with the so-called signal to the retarder. And I point out, Your Honors, that all of the evidence they point to in pages 3 through 5 of the reply doesn't have anything to do with a so-called signal to the retarder. Dr. Metz, they point to Metz's testimony, or evidence, in JA 707-01, which is paragraphs 166 to 170. That's not a signal to the retarder. If you go back and look at page JA 698, they've totally mischaracterized that evidence. That's the signal that comes out of that timing controller. They also point to a figure on page 5, which is the overdrive voltage response. That's not a signal to the retarder. As we point out on page 53 of our brief, and as Dr. Metz testified extensively, that is the voltage difference between those plates inside the red box. It doesn't say anything about the signal to the retarder. They even mischaracterized Dr. Yeh's testimony at JA 11641 to 642 to say he testified about the stepped voltages coming out of the storage capacitor. If you read the testimony, Your Honors, he said quite the opposite. He said, you can't measure it. He says, you have to simulate it. And he says, it's not a square wave. It's not a constant wave. It peaks up and peaks down. I think these misrepresentations of the record, quite frankly, are inexcusable. They're based on a new condition that didn't exist from any point during the case. There is no signal to the retarder. They tried to fix it on reply. They can't. But there's no evidence anywhere in this record of something that applies to all the claims. Claims 1, claims 20, all the other claims of a supplied signal to the retarder that meets the three amplitude limitations. So, Your Honors, really at this point in time, there is no factual dispute because we're dealing with a situation where there's no evidence. And there's no evidence because Dr. Metz didn't put in any evidence of the supplied signal because he knew if he did, he couldn't prove it. But how do you control a retarder if there's no signal to it? There is a signal. But the signal is a single pulse, right? Which then goes to a storage capacitor under the sample and hold signal circuit, right? So, rather than a constant signal going in or holding it there, there's a pulse, a pulse, a pulse. They never read that supplied signal on the claims because they can't if it doesn't have the three amplitude limitations. It's a pulse, a pulse, a pulse. So they never put in any evidence that these pulses are the supplied signal or meet the claim and read on the claim and they ignored what was supplied and instead looked at what's going on inside the box and tried to infer what was supplied. But you can't infer because even though, as Your Honor pointed out, these constant signals at the electrodes, those signals are generated by something that's not a constant signal that's supplied, supplied by a quick burst, a quick pulse. And their expert did not try to read that. But that's the only signal that's supplied. Thank you, Mr. Goss. We will now hear from Mr. McPhail. May it please the Court. Don McPhail, Court of Appeal of Counterfeit Achievement Defendants. I'd like to address the first drive means limitation, which is independent of the complementary grounds for affirming the district court's grant of summary judgment here. The district court properly found, and I think the record shows, that Dr. Metz did not opine on any structure within the Chime devices or the AUO devices that would correspond to the properly construed first drive means. When he did his analysis, he always incorporated the storage capacitor and elements of the pixel to try and talk about, just like Mr. Goss was saying, the signal. He never analyzed the structure that delivers that signal to the pixel and showed how that would be either the same as or an equivalent of the first drive means. It clearly was not the same as district court found, as the structures were different. But he never gave any sort of analysis to show why what he viewed as the first drive means, other than that storage capacitor, without that storage capacitor, was in any way infringing. So again, we have a lack of evidence. He did not provide any testimony as to the properly construed term to show how that particular limitation was met by either CMO or by any of those devices in this case. The second limitation I'd like to deal with is the Claim 20 issue, which has been raised here again. First of all, I think it's clear that at no time at summary judgment were following summary judgment, and there were multiple exchanges with the court. Appledine got re-argument of summary judgment, and never once did they raise with the district court the idea that she had not construed or had not properly analyzed Claim 20. That's got to be wavered if there ever was one. It's not proper for them now to stand before you and say, well, there's not adequate evidence below it because the court didn't deal with it, when they never asked the court to deal with it. And in Marksman, they never said there was anything special about Claim 20 that would not fall within all the construed claims of the other terms. Wasn't the argument that there was no difference between Claim 20 and Claim 1, no essential difference? That's exactly what they put in their Marksman, Your Honor, yes. And that should be in the Joint Appendix. I apologize, they don't have the page for you. But that is in their Marksman briefing. When Claim 20 came up, they said this should be construed the same way as Claim 1. There is no substantive difference here. So we're still back at the lack of evidence when it comes to the first drive means. Dr. Metz did not offer any testimony that would comply or comport with the correctly construed terms, so the record below is devoid of any evidence that might raise an issue of fact. Summary judgment is properly granted either on the basis raised by Mr. Gotts for AUO or on this basis. Either one would be sufficient, and we only need one. We don't need them both. They have to overcome both of them. Are there any questions? Apparently not. Mr. McPhail? Mr. Seidman, we'll give you two minutes to respond. Thank you, Your Honor. Let's get first to the no evidence issue on the signal and the three amplitude signal. Dr. Metz gave an opinion in which he inferred the existence of the three amplitude signal. Actually, he really can't. Neither Dr. Yeh nor Dr. Metz could actually physically measure a signal at the pixel electrodes. Those things are really small. It's not something that you could actually physically do. But the tests are only one part of it. Dr. Metz relied on the documents and the testimony, and he clearly opined that the grayscale values that one finds correspond to corresponding voltage signals that create the grayscale values. You can't create the change without having voltage signals. So Dr. Metz concluded and found that the existence of, for example, the 45, the 60s, and the intermediate 118, that those grayscale values correspond to voltage values and show the three amplitude signal. So it's simply incorrect to say that there's no evidence. And as to the concept of looking from the perspective of the retarder, and what you have to look at is the signal to the retarder. If you can look at our opening brief, we said the same thing. We didn't save it for our reply brief, and that's been Appledine's position all along. And that's what the patent says. The patent talks about solely, the only signal the patent talks about is the signal to the retarder. So to suggest that somehow this is made up and has nothing to do with the patent is simply incorrect. Now... You're limiting your argument when you talk about the signal. There's a signal from the retarder. But what about the signal going to the retarder? Is there another signal? Well, the signal the retarder sees is the signal that goes to the retarder, yes. And as to claim one, it comes from the drive means, which Dr. Metz actually described at length as to how their... It's in our brief. There's no way I can do justice to it. I'm already over my time. But yes, Dr. Metz described what... Remember that under 112.6 and the doctrine of equivalence, you don't have to have a one-to-one equivalent between the black boxes that are shown in Figure 7 and what their drive circuitry does. That's not required. So I know I've gone over my time. If you all have any questions, I'd be happy to answer them. Thank you, Mr. Seidman.